# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

MARY STEWART,       )
                     )
         PLAINTIFF    )
                     )
v.                     )       No. 2:11-CV-396-DBH
                     )
PATRICK J. FLEMING, ET AL.,   )
                     )
         DEFENDANTS   )

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The sole issue on this motion for summary judgment is whether the defendants, Maine State Troopers Joseph A. Mills and Joseph Bureau, have qualified immunity for their arrest of the plaintiff Mary Stewart on the evening of June 23, 2009.[1] I conclude that on the undisputed facts the defendants are entitled to qualified immunity and grant their motion.

### PROCEDURAL POSTURE

Stewart sued the Troopers in Cumberland County Superior Court. The Troopers removed the lawsuit to this court, asserting federal question jurisdiction. Notice of Removal (ECF No. 1). After the plaintiff amended her complaint, I granted a motion to dismiss the chief of the Maine State Police as

---

[1] Although the First Amended Complaint asserts four causes of action (false arrest; excessive force; malicious prosecution; and abuse of process), in responding to the motion for summary judgment the plaintiff decided to "narrow the scope even further. The bottom line is whether or not probable cause, arguably existed so that the Defendant could place Ms. Stewart under arrest in late June 2009. If there arguably was probable cause, the result is judgment for defendant on all counts." Pl.'s Opp'n to Defs.' Mot. for Summ. J. 1 (ECF No. 37). I take the plaintiff at her word and address only the arrest/probable cause issue.

a defendant, leaving only Troopers Bureau and Mills as defendants. Decision and Order on Mot. to Dismiss (ECF No. 25). After the close of discovery and after a Local Rule 56 conference, Bureau and Mills moved for summary judgment on all counts of the Amended Complaint.

### FACTUAL BACKGROUND[2]

On June 15, 2009, Mary Stewart (then known as "Mary Smyth") reported a burglary of her apartment to the Maine State Police. She claimed the loss of jewelry, compact discs, and cameras. Defs.' Statement of Material Fact ("DSMF") ¶ 4 (ECF No. 35); Pl.'s Am. Resp. to Defs.' Statement of Material Fact ("Pl.'s Am. Resp.") ¶ 4 (ECF No. 38). Trooper Bureau went to the apartment to investigate. DSMF ¶ 5; Pl.'s Am. Resp. ¶ 5. After Trooper Bureau found the main door to the apartment screwed shut from the inside, Stewart brought him into her apartment through an area under construction, where Stewart pointed out footprints visible in drywall dust on the floor. DSMF ¶¶ 6-7; Pl.'s Am. Resp. ¶¶ 6-7.

Stewart told Bureau that she had not been in the apartment for two weeks and that some of her personal property was taken during this time. DSMF ¶ 8; Pl.'s Am. Resp. ¶ 8. She then led Bureau through her apartment

---

[2] The facts are largely undisputed. After a Local Rule 56 conference, the parties stipulated that certain documents were part of the summary judgment record. Stip. of the Parties for Purposes of Summ. J. (ECF No. 35-1). I take that stipulation to mean that I should consider those documents as admissible evidence for purposes of the summary judgment motion without further concern about authenticity, hearsay, etc. The defendants filed a statement of material fact and the plaintiff filed a response to that statement. In the Factual Background I recount in text, I rely on those statements that are admitted by the plaintiff. Where the plaintiff denies a statement, I examine the record citations of each party to see whether their respective assertions are supported by the record they cite, and rule accordingly whether the asserted fact is established or in dispute.

and informed him that she was missing at least 100 CDs.  DSMF ¶¶ 9-10; Pl.'s Am. Resp. ¶¶ 9-10.  Among the CDs reported missing were a Beatles boxed set which Bureau and Stewart later found in the living room as well as "Lost Lennon" CDs, some of which Bureau also found in the apartment.[3]  DSMF ¶¶ 9-11; Pl.'s Am. Resp. ¶¶ 9-11.  Bureau noted that many of the CDs in Stewart's apartment were copies that had been recorded onto blank compact discs.  DSMF ¶ 12; Pl.'s Am. Resp. ¶ 12.  Stewart could not specify how many CDs in excess of 100 were missing and could not specify a dollar amount for her alleged loss.[4]  DSMF ¶ 13; Pl.'s Am. Resp. ¶ 13.  While inspecting the apartment, Bureau observed that the dust on Stewart's music collection suggested that it had not been disturbed, and noted that her stereo speakers, flat screen television, stereo receiver, and compact disc player were seemingly untouched.[5]  DSMF ¶¶ 14-15; Pl.'s Am. Resp. ¶¶ 14-15.  Bureau asked Stewart to itemize and assign a value to each of the missing items.  DSMF ¶ 16; Pl.'s

---

[3] Defendants claim in their Statement of Material Fact that Bureau discovered the Beatles boxed set and some of the Lost Lennon CDs; Stewart qualifies this, claiming that she herself discovered these items and that Bureau's report accordingly states that "we" discovered them. DSMF ¶¶ 10-11; Pl.'s Am. Resp. ¶¶ 10-11.  Stewart is correct as to the Beatles boxed set, which Bureau's report states that "*we* later found," Stip. R. at 28 (ECF Nos. 35-1-3) (emphasis added), but the record offers no support for her contention that she and Bureau together discovered the Lost Lennon CDs: Bureau's report states "*I* also found several of the Lost Lennon CD's . . . .," id. (emphasis added).

[4] Stewart qualifies the defendants' assertion that she did not have any idea how many compact discs were missing by asserting that she had told Bureau that at least 100 were missing.  Pl.'s Am. Resp. ¶ 13.  Since the Police Report that the parties cite is ambiguous on this topic ("Mary walked me through her apartment telling me several CD's had been taken.  Mary had well over 100 CD's on the top of an entertainment center in the living room of the apartment."), I have accepted her qualification.  Stip. R. at 28.  Indeed, the defendants themselves appear to have admitted this, since paragraph 10 of their Statement of Material Fact states that "Stewart claimed [to Bureau] that there was at least one-hundred [*sic*] compact discs missing."  DSMF ¶ 10.

[5] Stewart qualifies this, claiming that Bureau "observed that there were fingerprints on the TV showing use" and that "[t]he Trooper did not mention the empty slots," but she provides no record citation to support either of these contentions.  Pl.'s Am. Resp. ¶¶ 14-15.

Am. Resp. ¶ 16.   Stewart then claimed that she was missing items totaling $11,150, including more than 100 CDs, two cameras and assorted jewelry. DSMF ¶ 17; Pl.'s Am. Resp. ¶ 17.   Most of the missing CDs were copies of originals.   DSMF ¶ 18; Pl.'s Am. Resp. ¶ 18.

The following day, Bureau received a telephone call from an insurance adjuster assigned to Stewart's claim.[6]   DSMF ¶ 19; Pl.'s Am. Resp. ¶ 19.   The adjuster told Bureau that Stewart's claimed loss was the second one within the last month and that the insurance policy was newly purchased.[7]   DSMF ¶ 20; Pl.'s Am. Resp. ¶ 20.   The adjuster advised Bureau that Stewart was claiming a total loss of $22,155 from the allegedly missing items, nearly twice the $11,150 she had reported to Bureau a day earlier.[8]   DSMF ¶ 21; Pl.'s Am. Resp. ¶ 21.

On June 22, Bureau returned a phone call to Stewart, who wanted to know if he had completed his report of the burglary and if he had determined whether footprints in the drywall dust were those of her landlord.   DSMF ¶¶ 23-24; Pl.'s Am. Resp. ¶¶ 23-24.   Bureau met with Stewart at her motel in

---

[6] Stewart denies this assertion, claiming that "[n]o such phone call is recorded in AAA insurance's phone log for that or any other date," and citing the Stipulated Record at 93-95, the insurance company's phone log.   Pl.'s Am. Resp. ¶ 19; Pl.'s Opp'n to Defs.' Mot. for Summ. J. 2.   However, the defendants correctly point out that under Fed. R. Evid. 803(7), in order to prove the nonoccurrence of an event from its absence in a record, the proponent must show that "a record was regularly kept for a matter of that kind," a foundation that Stewart has failed to establish.   Reply to Pl.'s Opp'n to Defs.' Mot. for Summ. J. 1 (ECF No. 39).   The AAA phone log is in evidence by virtue of the stipulated record, but there is no affidavit or deposition from the insurance agent that every such call as that alleged here would be recorded, so as to justify the inference that the phone call did not occur.   (At the Local Rule 56 conference, there was discussion about supplying an affidavit or deposition of the adjuster.)   I therefore treat the defendants' assertion on this point as not successfully contradicted.

[7] I reject Stewart's denial (based solely upon the absence of this call in the adjuster's phone records) for the reasons stated in note 6 <u>supra</u>.   The call is referred to in Bureau's report.   Stip. R. at 30.

[8] I reject Stewart's denial (based solely upon the absence of this call in the adjuster's phone records) for the reasons stated in note 6 <u>supra</u>.   The call is referred to in Bureau's report.   Stip. R. at 30.

Bridgton.[9]  DSMF ¶ 25; Pl.'s Am. Resp. ¶ 25.  Bureau told Stewart that he had

not yet spoken with her landlord and that he found the whole thing

"suspicious."[10]  Stewart became angry, raised her voice and accused Bureau of

harassing her and calling her a liar.[11]  DSMF ¶ 27; Pl.'s Am. Resp. ¶ 27.

Bureau told Stewart the reasons for his suspicion, including the fact that

Stewart's landlord was the only other key holder to the apartment, and that

she had nevertheless decided to leave her apartment unsecured while she lived

---

[9] The defendants assert that Stewart agreed to Bureau's request for a meeting.  DSMF ¶ 25.
Stewart denies, saying that she did not want Bureau to come to the hotel, but that he did
nonetheless.  Pl.'s Am. Resp. ¶ 25.  She cites the Stipulated Record at 108, where she says that
in a handwritten document.  I therefore do not accept the defendants' assertion that she agreed
to the meeting.

[10] Stewart qualifies this assertion, stating that "Trooper Bureau was referring to a human
rights complaint Plaintiff filed against him, he had just wrongfully read, as 'suspicious', not an
insurance claim," and cites the same handwritten document.  Pl.'s Am. Resp. ¶ 28.  That
handwritten document states that on June 22, 2009, Bureau called Stewart "around 8:00 pm,
Wanted to see the Human rights paper work I had Notorized [*sic*] and sent back to you guys
but I had a copy made For myself."  Stip. R. at 108.  The next page, not cited, adds that after
Bureau arrived at the motel, "he told me he wanted to see the papers I had from you guys, not
knowing I could of told him no until today, I handed them to him.  He read them and then
proceeded to tell me that he thinks this whole thing is 'suspicious' because there was so much
'drama' as he put it going on.  I said of course there is Drama when a apt manager is being
sued for Sexual Harrasment [*sic*] and served papers of no trespassing on his ex partner and
friend which is my boyfriend."  Id. at 109.  The handwritten document is addressed: "Att:
Housing," and is captioned as a "Civil Complaint against trooper Bureau and his Sgt Mills
troop B."  Id. at 108.  However, it is not apparent that this document is a human rights
complaint, and the document refers to a sexual harassment complaint against Stewart's
landlord.  In any event, it establishes that Bureau said "that he thinks this whole thing is
'suspicious.'"  Id. at 109.

[11] Stewart qualifies this assertion, claiming that she was angry not at the word "suspicious,"
but "because the Trooper was harassing her and not properly investigating her claim."  Pl.'s
Am. Resp. ¶ 27.  She cites page 110 of the Stipulated Record, which seems to describe feelings
Stewart had after her anger.  But the reference to her anger is on the previous page, where she
says that "I asked him so what are you getting at? telling me I've made this up? he basically
shrugged a shoulder and said well It does look suspicious if you ask me.  I did get angry at him
and told him so and asked him when he was gona [*sic*] do his job about matching up the foot
Prints he took Pictures of."  Stip. R. at 109-10.  Thus the record supports the defendants'
assertion and does not contradict or qualify it.  In any event, the subjective basis for Stewart's
anger is irrelevant to an analysis of whether Bureau had probable cause to arrest her; the
record supports that the sequence Bureau observed was that she grew angry after Bureau used
the word "suspicious."

elsewhere, in a motel in Bridgton.[12]  DSMF ¶ 28; Pl.'s Am. Resp. ¶ 28.  Bureau then terminated the interview because Stewart had become hostile.[13]  DSMF ¶ 29; Pl.'s Am. R. ¶ 29.  Stewart was emotionally upset.  Id.  In a subsequent interview with Stewart's landlord, Bureau learned that she was two months behind on her rent, had left property in the apartment allegedly burglarized, and was living in the Bridgton motel with her boyfriend.  DSMF ¶ 30; Pl.'s Am. Resp. ¶ 30.

The next day, June 23, Bureau received another telephone call from Stewart's insurance adjuster.[14]  DSMF ¶ 31; Pl.'s Am. Resp. ¶ 31.  The adjuster informed Bureau that Stewart's claim for $22,155 claim had been denied because her policy provided only $1,000 in jewelry coverage, and that after receiving that denial, Stewart submitted a "re-calculated" claim for $39,015.[15]  DSMF ¶ 32; Pl.'s Am. Resp. ¶ 32.  In this recalculated claim, Stewart described 100 compact discs taken from her apartment as rare collectibles worth $16,860, and she made additional claims for mental and emotional suffering

---

[12] Stewart denies this assertion without further elaboration.  Pl.'s Am. Resp. ¶ 28.  The portion of the record she cites, the handwritten document, does not refer to what explanation, if any, Bureau gave her for being suspicious, but it also does not state that he gave no explanation.  Stip. R. at 108-10.  The mere fact that Stewart's handwritten document makes no mention of an explanation from Bureau does not prove that no explanation was given.  Cf. note 6 supra.

[13] Stewart denies this, stating that she "was emotionally upset and the trooper refused to leave when asked."  Pl.'s Am. Resp. ¶ 29.  The portion of the record she cites supports her claim of emotional upset, but does not show that she ever asked Bureau to leave.  Stip. R. at 109-10.

[14] I reject Stewart's denial (based solely upon the absence of this call in the adjuster's phone records) for the reasons stated in note 6 supra.  The call is referred to in Bureau's report.  Stip. R. at 31.

[15] I reject Stewart's denial (based solely upon the absence of this call in the adjuster's phone records) for the reasons stated in note 6 supra.  The call is referred to in Bureau's report.  Stip. R. at 31.

bringing the total claim to $44,200.55.[16]   DSMF ¶ 33; Pl.'s Am. Resp. ¶ 33. After collecting statements from three witnesses, Bureau called the insurance adjuster and advised him that Stewart herself was now the focus of investigation for theft by insurance deception.[17]   DSMF ¶ 34; Pl.'s Am. Resp. ¶ 34.  A State Bureau of Identification check on Stewart disclosed several prior thefts, including three within the past ten years.  DSMF ¶ 35; Pl.'s Am. Resp. ¶ 35.

Shortly before 10 P.M. that evening, Bureau and Sgt. Joseph Mills met with Stewart and her boyfriend at the Bridgton motel where they were staying. DSMF ¶ 36; Pl.'s Am. Resp. ¶ 36.  Bureau asked Stewart to explain why her allegedly missing bootlegged compact disc collection was worth $15,000. DSMF ¶ 37; Pl.'s Am. Resp. ¶ 37.  Stewart explained that she had a number of rare albums that she had sold to other collectors over a year earlier and that she had made copies of the albums before selling them.  DSMF ¶ 38; Pl.'s Am. Resp. ¶ 38.  Bureau concluded that Stewart was now claiming full price to her insurance company for original albums sold to other collectors.[18]   DSMF ¶ 39; Pl.'s Am. Resp. ¶ 39.  Bureau then placed Stewart under arrest for theft by

---

[16] I reject Stewart's denial (based solely upon the absence of this call in the adjuster's phone records) for the reasons stated in note 6 supra.  The call is referred to in Bureau's report.  Stip. R. at 31.

[17] Stewart qualifies this assertion, stating that Bureau told the adjuster that Stewart was under arrest, not under investigation.  Pl.'s Am. Resp. ¶ 34.  The record citation refers to an adjuster-documented phone call the next day informing the adjuster that Stewart had been arrested, but it fails to show that Bureau did not also call the adjuster the previous day to inform him then that Stewart was under investigation.  Stip. R. at 89.  The absence of such a call from the adjuster's records does not establish that the call did not take place, see note 6 supra.  It is documented in Bureau's report for the events of June 23, Stip. R. at 31-32.

[18] Stewart qualifies this assertion, stating: "This is Troopers [sic] conclusion although possibly erroneous."  Pl.'s Am. Resp. ¶ 39.  She cites no record support for the assertion that it is possibly erroneous.

insurance deception, and explained to her why she was being arrested.[19] DSMF ¶ 41; Pl.'s Am. Resp. ¶ 41. Bureau said to Stewart, "You're trying to get money from copied CDs," and told her she was trying to get her insurance company to pay for CDs she had already copied and sold. DSMF ¶ 43; Pl.'s Am. Resp. ¶ 43. Bureau then transported Stewart to the Cumberland County Jail. DSMF ¶ 46; Pl.'s Am. Resp. ¶ 46.

The State of Maine filed a criminal complaint against Stewart on June 26, 2009, charging her with attempted theft by unauthorized taking or transfer in violation of 17-A M.R.S.A. §§ 152(1)(D) and 353(1)(B)(1). DSMF ¶ 51; Pl.'s Am. Resp. ¶ 51. On September 8, 2009, the State dismissed its claim against Stewart due to insufficient evidence. DSMF ¶ 53; Pl.'s Am. Resp. ¶ 53.

## ANALYSIS

Bureau and Mills argue that the defense of qualified immunity entitles them to summary judgment on the false arrest claim and Stewart agrees that a showing of probable cause, or even arguable probable cause, is dispositive.

---

[19] Stewart qualifies the assertion, admitting the arrest but contending that the reason for her arrest was not explained at the time and the reason given was "Because I just told you." Pl.'s Am. Resp. ¶ 41. The portion of the record Stewart cites shows that when Stewart asked what she was being arrested for, Bureau immediately responded, "Theft by insurance deception." Stip. R. at 65. Bureau said "Because I just told you" when Stewart asked again why she was under arrest. Id. Defendants further assert that Bureau "explained to Stewart that she was being arrested because she had made copies of her original albums, sold the originals to a collector for what they were worth, and told her insurance company that the copies were worth the same amount of money as the originals." DSMF ¶ 42. Stewart denies this and claims that this explanation was instead given to her boyfriend. Pl.'s Am. Resp. ¶ 42. Since the portion of the record Stewart cites shows that Bureau gave this explanation referring to Stewart in the third person, and since it is at least ambiguous as to whether the explanation was given in Stewart's presence, I accept Stewart's denial. Stip. R. at 66.

Defs.' Mot. for Summ. J. 1-2 (ECF No. 34); Pl.'s Opp'n to Defs.' Mot. for Summ. J. 1, 3 (ECF No. 37).

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).[20]

The Fourth Amendment "demands that an arrest be supported by probable cause." Santiago v. Fenton, 891 F.2d 373, 383 (1st Cir. 1989) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). For Bureau and Mills to establish qualified immunity, they need not show that they had actual probable cause, but rather merely that "the presence of probable cause [was] at least arguable" at the time they arrested Stewart, such that a "reasonable officer could have believed that probable cause existed to arrest" Stewart. Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992) (citations omitted). Put differently, Bureau and Mills are entitled to qualified immunity "unless there *clearly* was no probable cause at the time the arrest was made." Topp v. Wolkowski, 994 F.2d 45, 48 (1st Cir. 1993) (quoting Floyd v. Farrell, 765 F.2d 1, 5 (1st Cir. 1985)).

---

[20] In the First Circuit, qualified immunity is determined by a two-part test:  "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (citing Pearson, 457 U.S. at 815-16). The second prong of the qualified immunity analysis has two aspects: whether the law was clear at the time that the plaintiff's constitutional rights were allegedly violated, and whether a reasonable official would have understood that his or her conduct was unlawful under the particular circumstances of the case.  Id.; see also Lopera v. Town of Coventry, 640 F.3d 388, 396 (1st Cir. 2012).  Under the second prong, the "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Brosseau v. Haugen, 543 U.S. 194, 199 (2004).

The undisputed facts here establish that with the information available to Bureau and Mills, a reasonable officer could have believed that probable cause existed to arrest Stewart.[21]   Probable cause demands only "reasonably trustworthy information such as would lead a prudent person to believe that the suspect likely had committed or was committing a criminal offense." United States v. Lee, 317 F.3d 26, 32 (1st Cir. 2003) (citations omitted).   Before arresting Stewart, Bureau had observed signs that her CD collection and home entertainment center had not been substantially disturbed, and he learned that although she now lived elsewhere, she continued to leave her property in the allegedly burglarized apartment.   Some of the albums Stewart initially reported missing were discovered by Bureau in the apartment.   The $11,150 loss Stewart reported to Bureau had nearly doubled in Stewart's initial insurance claim for $22,155, and quadrupled in her recalculated claim for $44,200.55.   After originally being unable to identify the titles of the stolen CDs, Stewart subsequently valued them at $16,860 in her recalculated claim. Stewart was claiming that they were rare collectibles, whereas Bureau understood them to be copies and believed that Stewart was making a claim for the full price even though she had previously sold the originals to other collectors.   This loss was the second claim on a new policy.   Stewart was in apparent financial difficulty, being behind on her rent.   In addition, Stewart

---

[21] Stewart argues against probable cause on the basis that "[t]he Troopers did not even have a complaining victim because the insurance company did not contact them to file a complaint." Pl.'s Opp'n to Defs.' Mot. for Summ. J. 2.   Whether or not the insurance company contacted the police to file a complaint has no bearing on whether the officers had probable cause to arrest Stewart based on the evidence uncovered in their investigation.   A complaining victim is not a prerequisite to an arrest for a crime.

had a history of thefts.[22]    With this knowledge, Bureau was justifiably suspicious by the time he arrived at Stewart's motel on the evening of June 23. In his conversation with Stewart immediately before her arrest, Bureau obtained further incriminating evidence, namely Stewart's admission that she had sold the original albums over a year earlier and that she had made copies of the albums before selling them.   This information could lead a reasonable and prudent police officer to "believe that [Stewart] likely had committed or was committing" the crime of theft by insurance deception.  Lee, 317 F.3d at 32. Certainly a reasonable police officer would not know that he was violating clearly established constitutional rights in making the arrest.[23]

---

[22] Stewart's prior convictions for theft bear on the question of probable cause even though the convictions would be inadmissible evidence of guilt under Fed. R. Evid. 404(b).  See, e.g., United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993) ("An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination." (citations omitted)); United States v. Friel, 448 F. Supp. 2d 222, 226 (D. Me. 2006) ("[L]aw enforcement's knowledge of previous trafficking activities by the defendant provided additional context for a probable cause determination."); see generally Brinegar v. United States, 338 U.S. 160, 172-73 (1949) ("There is a large difference between the two things to be proved [probable cause and guilt], as well as between the tribunals which determine them, and therefore a like difference in the quanta and modes of proof required to establish them.").

[23] In Hall v. Bates, 508 F.3d 854 (7th Cir. 2007), the Seventh Circuit upheld summary judgment on the basis of qualified immunity in a § 1983 action for false arrest like this one, brought by a plaintiff who had been arrested for insurance fraud but whose prosecution was subsequently dropped.  In Hall, the insured submitted an insurance claim of approximately $1,800 for stolen golf clubs and subsequently, at the insurer's request, reported the theft to the police.  Id. at 855.  While the insured told his insurer that the clubs were a well-known and expensive brand of iron (Ping), he reported a different, obscure brand (Shimano) to the police officer, who in turn misheard him and thought that the insured had named a brand ("Shapiro") that did not even exist.  Id. at 856.  The Seventh Circuit concluded that the circumstances were sufficient to establish probable cause:

> The discrepancy between what Hall told the police and what he had told the insurance company, the indication that the irons were much less valuable than he had represented them to be, his wife's statement to the police that she had remembered writing a check for $400 or $500 for the clubs (not $1,100 or $1,700 or $1,800 [the values varyingly claimed by Hall]), his seeming nervous when talking to the police and the fact that he kept glancing in an odd manner at his wife, along with the further oddity of his not having reported a residential burglary to the police until told to do so by the insurance company—the circumstances taken as a whole created probable cause to believe that Hall had committed insurance fraud, and so scotches his claim of false arrest.

*(continued next page)*

Because the undisputed evidence establishes that Bureau and Mills are entitled to qualified immunity for their arrest of Stewart on the evening of June 23 for theft by insurance deception, I conclude that Bureau and Mills are entitled to summary judgment.

### CONCLUSION

The defendants' motion for summary judgment is **GRANTED** on all counts.

**SO ORDERED.**

**DATED THIS 8TH DAY OF NOVEMBER, 2012**

/s/D. Brock Hornby
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

Id. Although the circumstances here are not perfectly identical to those of Hall—unlike Hall, Stewart reported the burglary to the police *before* submitting an insurance claim—the case for probable cause may in fact be stronger here.  Although Hall had identified different golf club brands to his insurer and the police, the difference in reported value ($1,800 versus $1,700) was relatively insignificant, id. at 855-56; Stewart, by contrast, submitted a recalculated insurance claim that, over time, grew to nearly four times the value she reported to Bureau, and as in Hall, the identity of the lost items was questionable (brand of golf clubs; status of missing CDs as rare collectibles or copies).